UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SENTARA HOSPITALS, et al.**, <br><br> Plaintiffs, <br><br> v. <br><br> **ALEX M. AZAR, II**, <br><br> Defendant. | Case No. 20-cv-3771 (CRC) |

## MEMORANDUM OPINION

The Medicare program reimburses hospitals for a portion of the bad debt they incur when indigent patients do not pay their deductibles or co-pays. Prior to 2020, Medicare rules left it up to the hospitals to determine whether a particular patient is indigent, using their own "customary methods." Plaintiffs—a group of hospitals operated by Sentara Healthcare (collectively "Sentara")—sought reimbursement for bad debt incurred from 2010 to 2013, but the Centers for Medicare & Medicaid Services ("CMS") Administrator ultimately disallowed the request. The Administrator concluded that Sentara had run afoul of the Medicare rules by improperly outsourcing its indigency determinations to the credit-reporting service Equifax. Sentara challenges the Administrator's decision, and both sides have moved for summary judgment. Finding that Sentara did not rely on Equifax to make its indigency determinations, and that it otherwise complied with the applicable reimbursement rules, the Court will grant summary judgment to Sentara.

I. **Factual Background**

   A. Medicare Reimbursement Rules

The Medicare program provides federal health insurance for elderly and disabled people. 42 U.S.C. §§ 1395 et seq. Medicare beneficiaries are responsible for paying deductibles and

coinsurance amounts for hospital services, just like in any private insurance plan. Id. § 1395e. When Medicare beneficiaries cannot pay, the unpaid bills become "bad debt" on the books of the hospital. 42 C.F.R. § 413.89(b) (2020).[1] The government will reimburse 70% of a hospital's qualifying bad debt. Id. § 413.89(h)(1)(iv).

The Medicare regulations lay out four requirements for bad debt to be considered reimbursable: (1) the debt must be related to covered services and derived from Medicare deductible and coinsurance amounts, (2) the hospital has to have made "reasonable collection efforts," (3) the debt must be "actually uncollectible," and (4) the hospital must have established, through the exercise of sound business judgment, that there is no likelihood of payment in the future. 42 C.F.R. § 413.89(e).

The Medicare Provider Reimbursement Manual ("PRM" or "Manual") is an agency-promulgated guidance manual that elaborates on these regulations. See Ctrs. For Medicare & Medicade Srvs. Pub. 15-1, Part I, ch. 3, § 308, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals/Items/CMS021929. The PRM provides that, if after "reasonable and customary attempts to collect a bill, the debt remains unpaid [for] more than 120 days . . . , the debt may be deemed uncollectible." PRM § 310. Relevant here, the PRM states that a hospital may forego "reasonable collection efforts" and still deem a patient's debt uncollectible if it determines the patient is indigent according to its own "customary methods." PRM § 312; AR 47–48.

The PRM contains four guidelines for hospitals to follow in applying their "customary methods" for determining indigency:

---

[1] Bad debts for Medicare beneficiaries are technically defined as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services." 42 C.F.R. § 413.89(b)(1)(i)(A) (2020).

2

    A. The patient's indigence must be determined by the provider, not by the patient; i.e., a patient's signed declaration of his inability to pay his medical bills cannot be considered proof of indigence;

    B. The provider should take into account a patient's total resources which would include, but are not limited to, an analysis of assets (only those convertible to cash, and unnecessary for the patient's daily living), liabilities, and income and expenses. In making this analysis the provider should take into account any extenuating circumstances that would affect the determination of the patient's indigence;

    C. The provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., title XIX, local welfare agency and guardian; and

    D. The patient's file should contain documentation of the method by which indigence was determined in addition to all backup information to substantiate the determination.

PRM § 312; Def.'s Reply at 2, ECF No. 20.

    Hospitals often make indigency determinations in connection with their "charity care" programs. Pl.'s Mot. Summ. J., ECF No. 14, at 4. These programs provide free or discounted health care for patients who meet certain criteria, regardless of whether the patient is also a Medicare beneficiary. If a hospital has a charity care program, it is required to use the same approach to determining indigency for both Medicare and non-Medicare patients. See Baptist Healthcare Sys. v. Sebelius, 646 F. Supp. 2d 28, 34 & n.7 (D.D.C. 2009). Charity allowances that are not related to Medicare deductibles or coinsurance amounts are not reimbursed by the federal government.

    At the close of each year, a hospital that provides services to Medicare patients files a cost report with a Medicare contractor (called a "MAC") in order to be reimbursed. The MAC makes a reimbursement determination for the year based on the report. 42 C.F.R. § 405.1803.

B.  Sentara's System for Determining Patient Indigency

Sentara operates a charity care program. Under the program, patients whose income is below 200% of the federal poverty level qualify for entirely free care, and patients who fall between 200% and 600% of the federal poverty level are eligible for sliding scale discounts. Pl.'s Mot. at 6–7; AR 633, 635, 827, 831. Sentara determines eligibility uniformly for all patients—i.e., indigency is measured the same way for Medicare and non-Medicare patients alike. AR 711 (Declaration of Andrew Weddle). The vast majority of Sentara's write-offs are for non-Medicare patients. AR 628, 713.

To determine a patient's income, Sentara first sends a statement to the patient with their balance and information about financial assistance programs. AR 709. It then obtains a custom report on the patient from the credit-reporting service Equifax. Id. The Equifax report includes "dozens" of financial elements, including mortgages, auto loans, credit delinquencies, and any judgments against the patient. AR 709, 774 (data table). The report also includes three predicative scores created by Equifax using a proprietary algorithm: an income predictor score ("IPS"), a payment predictor score ("PPS"), and a bankruptcy navigator index score ("BNI"). AR 709–10. The three scores are designed specifically for use by healthcare providers. AR 709.

Sentara maintains written policies for assessing all three Equifax scores when determining a patient's indigency. For example, a high income score but low payment predictor score would indicate someone who has the ability to pay but for whatever reason is unlikely to do so. Sentara would not classify that patient as indigent and would instead engage in more aggressive collection efforts. AR 710. In contrast, low income scores and payment predictor scores may indicate "genuine financial distress." Id. Such scores show a patient who both lacks the resources to pay a hospital bill and is also unlikely respond to collection efforts, meaning

4

(from Sentara's perspective) the account is likely to be "uncollectible and worthless."  Compl. ¶ 34; see also AR 712.

Sentara also attempts to obtain financial information directly from the patient through a written or telephonic charity-care application.  AR 710–11, 827–28.  When patients complete an application, Sentara will consider any documentation submitted by the patient, such as a W-2 or bank statement, and verify it against the information provided by Equifax.  AR 711.  Sentara calls this its "Charity by Application" process.

If the patient declines to respond to the hospital's information request, Sentara uses the data from Equifax and any additional financial information from other sources to determine the patient's indigency.  AR 711.  Sentara refers to this method of determining indigency as "Charity by Model."  If the data from Equifax and other sources indicate that a patient may be indigent, a Sentara staff member creates a charity application for the patient.  AR 710.  These Charity-by-Model patients must meet specific criteria—a low income, a low payment predictor score, and a high bankruptcy risk score—to qualify as indigent.  AR 712.  The application file includes any available financial data, whether from Equifax or other sources, and the three Equifax scores.  AR 711.  The application is then reviewed and either approved or denied by a senior-level manager in Sentara's Patient Accounting department.  Id.  If the application is denied, the account is designated for further collection activity.  Id.

## II. Procedural History

Sentara sought Medicare reimbursement for bad debts incurred from 2010 through 2013.  AR 45.  The Medicare contractor reviewed Sentara's cost reports for those years and disallowed reimbursement of all of Sentara's bad debts.  AR 46.  The contractor reasoned that Sentara

improperly relied on the Equifax scores to assess indigency, rather than independently verifying the patients' assets and liabilities as required by the PRM. AR 51–52.

Sentara appealed the contractor's decision to the Provider Reimbursement Review Board ("PRRB"). In an August 2020 decision, the Board agreed with Sentara and reversed the bulk of the contractor's findings.[2] The Board found that the Medicare guidelines do not impose a mandatory requirement to verify patients' assets and liabilities and that Sentara's methods for determining indigency met the requirements of the statute and the rules. AR 44–45, 57.

Just a few weeks after the Board issued its decision, CMS published a final rule amending its bad debt regulation. See 85 Fed. Reg. 58,432, 58,432 (Sept. 18, 2020). The new regulation no longer defers to hospitals' "customary methods" for determining indigency and now tells hospitals that they "must," rather than "should," consider a patient's assets and income. Id. Although some parts of the rule were made applicable retroactively, the amendments to the bad debt regulation were not made retroactive. See id. at 58,999 (stating that the rule is "finalizing these policies with an effective date for cost reporting periods beginning on or after October 1, 2020").

One month later, in October 2020, the CMS Administrator issued a decision reversing the Board on Sentara's appeal. The Administrator agreed with the Medicare contractor's initial interpretation of the bad debt regulation and disallowed reimbursement of all of Sentara's bad debts from 2010 to 2013. AR 21–22. The Administrator relied in part on the newly issued regulation, saying that it "clarified" CMS's longstanding policy that hospitals must

---

[2] The Board affirmed the contractor's decision with respect to patients who were married, because it found that the Equifax data does not capture any information whatsoever about the patient's spouse or the spouse's ability to pay. AR 67.

independently verify each patient's assets and liabilities. See AR 17–18; Def.'s Opp'n, ECF No. 17, at 14.

Sentara now appeals the Administrator's decision to this Court under 42 U.S.C. § 1395oo. Sentara claims the Administrator's decision is contrary to law and is unsupported by substantial evidence. Sentara seeks an order declaring the decision invalid and directing the contractor to recalculate the reimbursable amounts. The parties cross-moved for summary judgment, and the Court heard oral arguments on February 15, 2022.

### III. Standard of Review

The Court reviews the Administrator's final decisions on Medicare reimbursements under the Administrative Procedure Act ("APA"). See 42 U.S.C. § 1395oo(f)(1); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The Court may set aside the agency's determination only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence . . . reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706; Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14 (1971). The arbitrary and capricious standard is "highly deferential" to agency decision-making and "presumes the validity of agency action." Nat'l Mining Ass'n v. Mine Safety & Health Admin., 116 F.3d 520, 536 (D.C. Cir. 1997).

Summary judgment is appropriate in an APA case if the record, viewed in the light most favorable to the non-moving party, reveals no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

IV. Analysis

The government advances three arguments in support of the Administrator's decision. First, it maintains that section 312(B) of the Provider Reimbursement Manual *requires* a hospital to independently verify patient assets, and that Sentara's reliance on Equifax data did not satisfy this requirement. Second, it claims that Sentara's method of determining indigency violated section 312(A) of the Manual, which requires the *provider* to make its own indigency determination, not the patient. Finally, it argues Sentara failed to provide adequate documentation of its indigency determinations to the Medicare contractor, contrary to section 312(D) of the Manual. The Court takes these arguments in turn.

A. Consideration of Patients' Assets under PRM § 312(B)

1. *Was Consideration of Patient Assets Mandatory Prior to 2020?*

The parties vigorously dispute whether PRM § 312(B)'s statement that "[t]he provider *should* take into account a patient's total resources," means that the provider *must* do so. PRM § 312(B) (emphasis added). The government insists that the agency has always interpreted the provision as being mandatory, as confirmed by CMS's 2020 amendment to its bad debt regulations. Def.'s Opp'n at 20 ("The agency merely clarified in its 2020 rulemaking that when Manual § 312B and D indicated that providers 'should' take certain action, it had meant all along that they 'must' do so."). Sentara counters that, at least prior to the 2020 amendments, a natural reading of the word "should" implies that any analysis of patients' assets was merely suggestive, consistent with the overall flexibility for providers contemplated by the rules.

The agency's reading of the Manual has been rejected in three prior cases. See Baptist Healthcare Sys. v. Sebelius, 646 F. Supp. 2d 28, 30 (D.D.C. 2009) (finding the word "should" in PRM § 312 is a suggestion, not a mandate, and that § 312 "does not create a mandatory asset

8

test."); Shalala v. St. Paul-Ramsey Med. Ctr., 50 F.3d 522, 528 (8th Cir. 1995) ("Section 312(A) . . . does not support an interpretation which imposes an additional implied verification [of assets] requirement" on the provider); Harris Cty. Hosp. Dist. v. Shalala, 863 F. Supp. 404, 410 (S.D. Tex. 1994), aff'd, 64 F.3d 220 (5th Cir. 1995) (same). These courts rested their conclusions on both the common meanings of the words "should" and "must," as well as the Manual's alternate use of the two terms when describing different provider responsibilities. Compare, e.g., PRM § 312(A) ("the patient's indigence *must* be determined by the provider") with PRM § 312(B) ("the provider *should* take into account a patient's total resources"); see also, e.g., United States v. Concord Mgmt. & Consulting LLC, 317 F. Supp. 3d 598, 611 (D.D.C. 2018) ("[W]e presume differences in language . . . convey differences in meaning.").

The government criticizes the reasoning of these prior cases, arguing that the courts improperly relied on interpretative principles that are ordinarily applied to statutes and regulations to construe the PRM, which is an informal guidance document. Def.'s Reply, ECF No. 20, at 3–4. Sub-regulatory materials like the PRM, the government suggests, often contain colloquial language that should not be subject to the same level of grammatical scrutiny as laws or formal rules. Viewed in that context, the government maintains that the agency's (purportedly) longstanding interpretation of PRM § 312(B) as being mandatory is not arbitrary or capricious.

The government's position is not particularly convincing. As the cases cited above indicate, "should" and "must" commonly mean two different things and the agency's decision to alternate between the two, even in a guidance document, suggests that it thought so too. And its argument that the 2020 amendments simply "clarifie[d] and codifie[d]" the agency's existing understanding of the PRM criteria is undercut by two salient details: first, the new rule only

applies the amendments prospectively, see 85 Fed. Reg. 58432, 58999 (Sept. 18, 2020), and second, those amendments came in response to this court's express rejection of the Administrator's reading of the PRM in Baptist Healthcare. See 646 F. Supp. 2d at 35 ("The Secretary has the discretion to change the language of the PRM so that each paragraph uses the auxiliary verb *must*, but for some reason she has chosen not to.  In order to preclude courts from reaching the same conclusion in future decisions, the Secretary should amend Section 312 of the PRM.").

Furthermore, the plain language of PRM § 312(B) says the hospital should "take into account" a patient's total resources, including an "analysis" of assets, liabilities, and income and expenses.  That seems different from "verifying" those assets and liabilities, which, to the Court's ear, suggests a level of investigation beyond that contemplated by the rules.  The government's argument that "section 312 . . . requires *verifications* of each individual patient's assets, income, liabilities, and expenses," Def.'s Opp'n 14, stretches the text of the PRM.

Yet, Sentara's interpretation is not perfect either.  One would naturally expect a provider to "take into account" a patient's "total resources," including assets, liabilities, income, and expenses, as part of their "customary method" of assessing whether the patient can pay his bill. How else would one go about determining indigency?  It would also be odd for the PRM to outline a process that a hospital would be completely free to disregard.

The Court need not resolve this dispute, however, because even if PRM § 312(B) was mandatory for the cost years in question, Sentara complied with its requirements.

> 2. *Sentara Analyzed Patients' Actual Assets and Liabilities*

Assuming that PRM § 312(B) required Sentara to "take account" of the patient's "total resources"—including their assets, liabilities, income, and expenses—the summary judgment

record shows that Sentara did just that.  The Administrator's conclusion to the contrary is therefore unsupported by the record and must be set aside.

Starting with assets and income, the Equifax report that Sentara receives on each charity patient estimates the value of the patient's home or car based on the value of a home mortgage or auto loan in the patient's name.  Pl.'s Mot. at 35; AR 247, 709–10.  Sentara's Vice President of Revenue Cycle, Andrew Weddle, attests that a home and car "are the two major assets that . . . our patients have."  AR 247.  The Equifax report also captures other assets, such as monetary judgments, to the extent they exist.  AR 709.  With regard to income, Equifax provides the "income predictor score"—what the company's algorithm predicts the patient's income to be, based on an analysis of information in the individual patient's credit file.  AR 659–60, 709–11.  Equifax also "validates" this predicted income score against a national database of employer-reported income, as well as data maintained by Equifax's Mortgage Services division.  AR 710.  Sentara additionally confirms the patient's income whenever possible by contacting the patient directly.  AR 246, 266, 298.

The Equifax reports considered by Sentara also include information on patients' liabilities and expenses.  For example, the report indicates the patient's outstanding mortgage and auto loan liability, and the estimated monthly payments required to stay current on those debts.  AR 709–10.  The report also shows the patient's credit card liability, the number of accounts the patient has in collections, and the patient's overall collections balance.  AR 774–76.  Equifax additionally reports any delinquencies, judgments, or tax liens against the patient and whether the patient recently filed for bankruptcy.  Id.  All of that information either documents or analyzes individual patients' "liabilities" or "expenses."

The government faults the Equifax report for not "verify[ing]" a patient's assets and liabilities, calling it "a tool that only projects a beneficiary's economic status by looking at factors such as credit score, demographics, and zip code, but does not review liquid assets." Def.'s Opp'n at 14–15. It also complains that the report lacks "specific data tailored to the review of a particular individual's *actual* assets." Id. at 15 (emphasis in original).

These criticisms are belied by the record. The report furnished by Equifax is based on the patient's specific credit history and loan amounts, not an estimate based on general demographic information such as zip code. See AR 774–76. Furthermore, even if "[a]n Equifax credit score is not based on a review of the specific beneficiary's resources," as the Administrator found, AR 20, the Equifax report at issue here is not based on a patient's credit score alone. The record indicates that the three scores used by Sentara (although generated through Equifax's proprietary algorithm) are based on the patient's actual resources—their home mortgage amount, auto loan, and employer-reported income. The report compiled by Equifax may not capture every single liquid asset a patient has.[3] But it is hard to imagine *any* method of determining patient indigency that would unearth every potential asset and income source, especially when the patient does not respond to the hospital's written questionnaire or phone call.

Finally, Sentara analyzes a patient's actual assets and liabilities in its Charity-by-Application model. Under that program, Sentara employees obtain financial data directly from

---

[3] As the government points out, Equifax might not report patients' holdings in investment securities like stocks and bonds, or their interests in trust funds and the like. Def.'s Opp'n at 12. It strikes the Court as highly unlikely, however, that an individual who meets Sentara's indigency criteria would also hold significant amounts, if any, of these types of assets. See Pl.'s Reply, ECF No. 18, at 17 n.11 ("Federal Reserve Data show that the bottom half of American families by net worth hold only 1% of overall equities."). Regardless, the Administrator has not furnished any evidence that Equifax is systematically underreporting these types of investments and assets for Sentara's patients, nor has the Administrator argued that the PRM requires a hospital to ferret out *all* of a patient's assets and income sources before deeming them indigent.

the patient, "such as patient reported income, assets, liabilities, and expenses," as well as other documentation, "such as tax returns, bank statements, Social Security statements, W-2s, mortgage statements, [and] disability statements." AR 711.  Sentara then validates the patient's self-reported information against the Equifax data, and, when a discrepancy is found, "the account may be flagged for further investigation." Id.  It is hard to imagine what else a provider could do to reasonably assess the patient's ability to pay.

The Court therefore finds that the Equifax reports used by Sentara were based on an individual patient's actual assets—such as their home or car—and their actual liabilities—such as unpaid debt or outstanding judgments.  AR 247, 709–10.  The record shows that Sentara considered all of these financial metrics when making its indigency determinations, consistent with the guidance in the PRM.  The Administrator's decision to the contrary is unsupported by substantial evidence.

  B. <u>Provider Determination of Indigency Under PRM § 312(A)</u>

The Manual states that "the patient's indigence must be determined by the *provider*." PRM § 312(A) (emphasis added).  The government next argues that Sentara did not satisfy this provision because it essentially outsourced its indigency determinations to Equifax.  Def.'s Opp'n at 3, 17–18 (describing the Equifax report as a "speculative and perfunctory indigency assessment[] from a third party").  Sentara responds it made its own distinct indigency determinations, properly relying on patient-specific financial information in the Equifax reports in combination with the other information available to it.  Pl.'s Reply at 14, 16.  The record supports Sentara.

The Equifax reports provided to Sentara list a host of data points along with the three predictive scores discussed previously. See AR 709–10.  The record indicates that a Sentara employee used each of the three scores, plus any other data Sentara had about the patient's

13

financial condition, to decide whether a patient was indigent. For example, if the Equifax report reflected "an [income predictor score] showing ability to pay combined with a lower propensity to pay," a Sentara employee would deem the patient not indigent and further collection efforts would be undertaken. AR 710. However, if a patient file showed "a combination of low [income predictor score] and low [payment predictor score] score" Sentara would consider the patient to be "in genuine financial distress." Id. No one score from the Equifax report was determinative of indigency. For example, a high payment predictor score, high income score, and high available unused credit would place the patient in a "high likely to pay" category, and that account would be designated for more aggressive collection efforts. AR 157–58. In contrast, a combination of low-to-middling scores would indicate more information gathering by Sentara staff was needed. AR 157.

Patient accounts were identified as presumptively qualified for the Charity-by-Model program "where their Equifax [income predictor score] score shows them to be under 200% of the Federal Poverty Guidelines, and their other financial attributes . . . are consistent with indigence." AR 159.[4] These patients were then sent two billing statements and a letter describing Sentara's financial assistance program. If no additional information was forthcoming, a Sentara employee created a charity write-off application, which was then either approved or denied by a manager. AR 711. Only then did Sentara management consider the patient for charity write-off, and in doing so, would look "in greater detail at accounts with high values, data outliers, or a combination of values . . . prior to approving the account for write-off." AR 160.

---

[4] These other financial attributes include an "Open to Buy Bankcard" score and "HG BAL Mortgage" score. AR 159. While Sentara has not fully explained these scores, they appear to reflect the total balance on open mortgages and the patient's total credit limit or total unused credit on open credit cards. See AR 159, 612, 710 (describing the types of data Sentara uses).

The government does not dispute that these procedures are documented in the record. Nor does it suggest that Sentara failed to follow them here. Instead, it argues that Sentara "only segments beneficiaries into four categories pursuant to the scores assigned to them by Equifax, rather than conducting any actual analysis itself." Def.'s Supp. Resp., ECF No. 26, at 1. The government may be right about the segmentation. But Sentara developed the categories and the combinations of scores that qualify a patient for each category, not Equifax. AR 158. Moreover, Sentara employees analyzed additional data elements beyond the Equifax scores—the patient's mortgage balance and unused line of credit, for example—before determining patient indigency. That level of involvement and decision-making by the hospital makes clear that Sentara did more than simply rubber-stamp a low Equifax score, as the government suggests.

C. Documentation of Indigency Determination under PRM § 312(D)

As to the government's final argument, the Administrator found that Sentara failed to provide appropriate documentation of its indigency determinations because Equifax used a "predictive analytic modeling method . . . that is . . . not auditable." AR 19, 20–21. The government contends that this ran afoul of section 312(D), which provides that "the patient's file should contain documentation of the method by which indigence was determined in addition to all backup information to substantiate the determination." PRM § 312(D). The government maintains that Sentara did not provide documentation "to show, at minimum, that they examined at least some of the factors in Manual section 312, much less that they themselves conducted the inquiry." Def.'s Opp'n at 22 (emphasis omitted).

However, the government does not argue that Sentara failed to provide documentation of the *method* that it relied on—i.e., its analysis of the Equifax reports and any other documentation in the patient's file—as PRM § 312(D) sets forth. Rather, the Medicare contractor found that the

documentation was lacking because he could not audit the proprietary method Equifax used to calculate the three patient scores it provided to Sentara. As previously explained, Sentara's use of these predictive scores, in addition to other financial data, was an acceptable method of determining indigency under the regulations. PRM § 312(B). Sentara provided documentation *of that method* to the Medicare contractor. To the extent the government is arguing that the rules require the hospital to gather (and maintain) more granular financial information about each patient than it did here, the Court rejected that argument above.

In any case, the Administrator seems not to have relied on this rationale in her decision. See AR 19–21. As the Supreme Court has held, "the validity of an agency's determination must be judged on the basis of the agency's stated reasons for making that determination," Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 631 n.31 (1980), not on the post-hoc rationalizations of counsel, Loc. 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB, 546 F.2d 989, 991–92 (D.C. Cir. 1976). See also Byers v. Comm'r, 740 F.3d 668, 680 (D.C. Cir. 2014) ("Under the Chenery doctrine, a reviewing court must confine itself to the grounds upon which the record discloses that the agency's action was based.").[5] The Court rejects the government's argument for this independent reason as well.

---

[5] The Court notes one issue from the PRRB decision that both parties largely leave unaddressed: Whether Sentara followed its own written policy that required it to consider spousal income for patients who qualified as indigent under the hospital's Charity-by-Model approach. The PRRB found that Sentara had a policy of considering spousal income, but did not adhere to the policy for married patients who qualified as indigent based only on Equifax data. AR 67. The Administrator similarly disallowed reimbursement for this subset of patients, but on the ground that the legal "doctrine of necessaries" requires medical debts to be paid by the patient's spouse. AR 20. However, the Administrator admits that "this rule is not the law in all or many States," and cites no authority for the application of the rule in Virginia, where Sentara is based and, presumably, where most of its patients live. Id.

Furthermore, the section of the Manual that requires a provider to determine that "no source other than the patient would be legally responsible for the patient's medical bill," lists other legal sources of payment, "e.g., title XIX, local welfare agency and guardian," but not the

The Court therefore finds that Sentara supplied adequate documentation of its methods to the Medicare contractor under PRM § 312(D).  The Administrator's contrary conclusion is not supported by substantial evidence.

* * *

Sentara, accordingly, is entitled to reimbursement for its bad debts during the cost years 2010 through 2013.

## V.   Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' Motion for summary judgment and deny Defendant's Cross-Motion.  A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER<br>
United States District Judge

Date:  March 29, 2022

---

patient's spouse.  PRM § 312(C).  The Court therefore rejects the Administrator's stated rationale.  And to the extent the disallowance for married patients was based on the Board's original rationale, the agency seems to have given up that argument.  Accordingly, the Court will reverse the Administrator's decision with regard to married patients as well.